FILED

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

SEP 3 0 2005

CLERK

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| CRYSTAL SOULEK, | * | CIV. 03-4283 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| -vs- | * | MEMORANDUM OPINION |
|  | * | AND ORDER |
| CITY OF MITCHELL, | * |  |
|  | * |  |
| Defendant. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Pending are Defendant's Motion for New Trial or For Remittitur (Doc. 48), Plaintiff's Motion for New Trial (Doc. 50), Plaintiff's Motion for Front Pay Damages (Doc. 52), and Plaintiff's Motion for Attorney's Fees (Doc. 55). Both the Plaintiff's and the Defendant's Motions for New Trial are premised on Fed. R. Civ.P. 59(a), and both parties assert the evidence presented at trial was insufficient to justify the jury's verdict.

## INTRODUCTION

This matter was tried to a jury in January, 2005. The Plaintiff, Crystal Soulek, alleged she was terminated from her employment with the Defendant, the City of Mitchell, South Dakota, for discriminatory reasons. Specifically, she alleged discrimination based on race (Plaintiff is Native American), and/or that she was terminated in retaliation for engaging in a protected activity under Title VII. The jury found in favor of the Defendant on the discrimination claim, but in favor of the Plaintiff on the retaliation claim. It awarded damages for past lost wages in the amount of $64,270.00, and compensatory damages in the amount of $115,000.00. Judgment was entered on the verdict on February 11, 2005, allowing Plaintiff to tax costs. Plaintiff timely taxed her costs, the Defendant filed objections, and the Clerk taxed Plaintiff's costs in the amount of $1,412.28 on March 24, 2005.

The Court invited the parties to indicate whether either wished to be heard on the issue of front pay. Neither party requested a hearing, but Plaintiff made a motion for front pay (Doc. 52) and submitted a supporting brief (Doc. 53). Plaintiff has also moved for attorney's fees. Defendant resists Plaintiff's request for front pay and attorney's fees. Additionally, as mentioned above, Plaintiff and Defendant have each moved for a new trial on the claim on which they did not prevail, asserting the jury's verdict was against the weight of the evidence. The Defendant alternatively

requests remittitur as to the jury's damage award.

## DISCUSSION

### 1.   New Trial Motions

Both parties have moved for a new trial on the claims upon which they did not prevail. Both parties cite Fed. R. Civ. P. 59(a) in support of their motions. Rule 59(a) states in relevant part:

> (a)   Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; . . .

The Eighth Circuit has commented on the standard to be applied when the district court is presented with a Rule 59 motion for a new trial:

> There is a difference in the function of a judge when he is ruling on a motion for a directed verdict or a judgment n.o.v. and when he passes on a motion for a new trial. . . In the former instance, it is his duty to accept the plaintiff's version as true for purposes of the motion, notwithstanding the existence of strong testimony to the contrary; the judge is not concerned with the weight of the evidence. On the motion for new trial, however, he has wider, *though not unlimited*, latitude and he may set the verdict aside where it is against the weight of the evidence, or to prevent injustice.

Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc., 466 F.2d 179, 186 (8th Cir. 1972) cert. den. 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). The Court, however, is not free to reweigh the evidence and set aside a jury verdict merely because the jury could have drawn a different conclusion or because the judge feels a different result is more reasonable. Id.

On a motion for a new trial, "a trial court can rely on its own reading of the evidence–it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." Ryan v. McDonough Power Equipment, Inc. 734 F.2d 385, 387 (8th Cir. 1984). A new trial motion should be granted, however, only when the verdict is against the weight of the evidence and the Court is "left with a definite and firm conviction that the jury has erred." Id. "Regardless of the rhetoric used the true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred. When through judicial balancing the trial court determines that the first trial has resulted in a miscarriage of justice, the court may order a new trial, otherwise not." Fireman's Fund Ins. Co., 466 F.2d at 187. In other words, a new trial motion should only be granted when the jury's verdict is "egregious." "Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2nd Cir. 1998).

## A.    Defendant's Motion for New Trial (Doc. 48)

Defendant has moved for a new trial on the jury's finding in Plaintiff's favor on the retaliation claim. The jury received instructions regarding retaliation prohibited by 42 U.S.C. § 2000e-3 in Instruction No. 19. The jury found in favor of the Plaintiff on her retaliation claim, and awarded damages . Defendant asserts the evidence presented at trial was insufficient to sustain the verdict or, alternatively, requests remittitur of the damage award.

Instruction No. 19 guided the jury regarding the factors the Plaintiff needed to prove her retaliation claim. Those factors include: (1) Plaintiff engaged in a statutorily protected activity, that is, she in good faith asserted claims or complaints of discrimination prohibited by federal law;(2) an adverse employment action then occurred (an adverse employment action is one that causes a material change in the terms or conditions of employment); (3) the adverse employment action was causally related to the plaintiff's statutorily protected activities; and (4) the plaintiff suffered damages as a proximate or legal result of such adverse employment action. For an adverse employment action to be "causally related" to statutorily protected activities it must be shown that, but for the protected activity, the adverse employment action would not have occurred. Or, stated another way, it must be shown that the protected activity by the plaintiff was a substantial, motivating cause that made a difference in the defendant's decision.

The Defendant asserts the evidence was insufficient to support the verdict because the city officials all testified Plaintiff did not mention her racial discrimination claim at the City Council meeting where Plaintiff's three day suspension was decided, and they were unaware of Plaintiff's racial status until after she was terminated from her employment with the City of Mitchell.

Plaintiff had been a bus driver for the city of Mitchell since 1999. TR 202. She received excellent reviews in 2000, 2001, and 2002 (Exhibits 16,17 and 18). During the course of her employment, however, Plaintiff perceived that her department head (Brenda Paradis) made a lot of "racial remarks" to her about her Native American background. TR 208. For example, after a Fourth of July celebration, Brenda came into the office and asked Plaintiff how "did them goddamn Indians afford the fireworks?" TR 208. On Native American Day, Brenda told Plaintiff she should bring Indian tacos for free for everybody. TR 209. Brenda pulled Plaintiff into her office and made a point to tell her about some Native American children in her neighborhood who "were filthy dirty and their parents were probably drunk." Id. Plaintiff complained to her direct supervisor (Jo Hansen), and Jo talked to Brenda about Plaintiff's concerns. TR 210.

Finally, one of the other bus drivers started calling Plaintiff "Fry Bread" which is a Native American food . TR 210. The nickname caught on, and soon everyone in the office called Plaintiff

"Fry Bread." Id. Plaintiff found the nickname degrading, and complained to her supervisor (Jo) about it. TR 211. A staff meeting was held, and the department head (Brenda) announced there would be no more name calling. Nothing was said about race relations or discrimination–just that there would be no more name calling. Id. Brenda also questioned Plaintiff about going to the Indian Health Services station to obtain free medication, and called Teri Bertness (the City's Human Resources director) purportedly to ask if it was allowable to use sick time to go to the "Rez" to get free medication. Brenda jokingly asked Plaintiff if she would get her (Brenda) some free medication while she was there. TR 258-259.

After these incidents, after Plaintiff complained about the racial name calling, and after the meeting was held to address the problem, Plaintiff was involved in an accident while driving her bus on March 12, 2003. EX 22. She was in the process of picking up the last child on her route, when she parked her bus, honked, and waited for him to come out to the bus. TR 260. She tried to pull the bus a little closer, and hit a parked car. Id. Nobody was injured as a result of the incident. TR 51. According to protocol, Plaintiff called her supervisor (Jo), who called the police. Plaintiff received a citation, and went to the hospital for a drug/alcohol test, also pursuant to protocol. The test was negative. TR 262, 29-30.

Plaintiff returned to the office with the citation and other information she received from the police officer. Brenda met her with an expletive about how much the accident would cost the City in insurance. TR 263. Plaintiff's immediate supervisor (Jo) was on the phone, so Plaintiff went back out on her bus route to pick up a dialysis patient. TR 264. She was called back to the office and met with Brenda and Jo. They informed her she would be suspended for three days without pay. TR 265. Plaintiff became very upset. TR 267. She tried to explain that other drivers had been involved in more than one accident without being suspended. TR 265-267.[1] Plaintiff testified she raised her hands and dropped her sunglasses; Brenda and Jo gave differnt versions of the sunglasses and keys being thrown to the floor or against the wall. TR 362 (Jo –threw sunglasses to the floor); TR 403-404 (Brenda–threw the sunglasses and they hit the wall).

---

[1]Plaintiff presented at trial the names of several other city workers who had been involved in traffic accidents but had not been suspended. Randy Ahrendt collided with another vehicle on an icy road ; Dick Lemke ran through and intersection and ran his bus into a semi; Skip Brendan had a DUI and a careless driving citation; Craig Fuerst ran a stop sign and caused an accident; Robert Spangler was issued a citation for a stop sign violation; Dennis Comp ran into a parked vehicle; Roger Smith ran into a parked car; Roger Scharffenberg ran into a pedestrian with a bus; Leo Vanoverchelde was involved in two accidents, in one of which he hit a parked car. TR 34-53. Teri Bertness distinguished their circumstances by explaining, "Those were separate incidents. And again, we're not carrying passengers; we're not cited. Those–those were separate incidents." TR 53.

Plaintiff consulted the Human Resources director (Teri Bertness) who instructed her to follow procedure by appealing her discipline to the grievance committee, via the Mayor. TR 268. Plaintiff spoke to the Mayor. Plaintiff testified she told the Mayor she believed she'd been discriminated against because she was the only Native American. TR 269. The Mayor told Plaintiff to take her complaint to the grievance committee. TR 269.[2]

Plaintiff attended the City Council meeting on March 18, 2003. Plaintiff testified that she told the City Council about other drivers who had been involved in accidents and had not been similarly disciplined. TR 270. Plaintiff also testified that she believed she had been discriminated against. TR 270-271. The others who were present at the meeting agree that Plaintiff stated she did not believe she had been treated fairly, but disagree about whether she specifically stated she believed the unfair treatment was based on her race. TR 60-61, 92 (Bertness); TR 169 (Tracy); Tr 196 (Verhey). The City Council deliberated, and agreed that a three day suspension was an inappropriate discipline for the accident. It revoked the three day suspension for the accident, but re-imposed a three day suspension because it found Plaintiff had been insubordinate to her supervisor. TR 271.

When Plaintiff returned to the workplace after her three day suspension, (March 25th) there was a note on the desk, signed by Brenda, (EX 28) instructing her to clean the office until Brenda came in. TR 272. Also on the desk were Plaintiff's personal items from her bus. TR 272. Brenda, Jo, and Teri arrived at the office at 8:00 a.m. to meet with Plaintiff. TR 273. They presented Plaintiff with a written version of the discipline imposed by the City Council (EX 26) and asked her to sign it. TR 273-74. The document was a formal disciplinary action which imposed a three day suspension without pay and six months of "probationary status" thereafter. It was addressed to

---

[2]The Mayor's testimony about whether/when she became aware Plaintiff believed her different treatment was based on race was confusing, at best. At trial, Mayor Clagett first testified Plaintiff did not mention during the city council meeting that she (Plaintiff) was the only Native American in her department. TR 130. However, when she was reminded of her deposition testimony, she agreed that, during her deposition, she had answered otherwise. TR 133. In her deposition, Mayor Claggett specifically recalled Plaintiff alleging she had been ridiculed about her Native American accent (TR 134) and stated the City Council members talked to Plaintiff about her allegations, saying "no, we don't discriminate." (TR 135). When Plaintiff's counsel tried to clarify during the deposition that Plaintiff raised the race issue during the City Council meeting, Mayor Claggett stated "Absolutely, yes, she did." TR 136. Defense counsel also questioned the Mayor during her deposition, and she explained the first time she learned Plaintiff claimed race was a factor in her suspension was during the City Council meeting during the executive session portion of the meeting. TR 138. Mayor Claggett also stated she believed it was insubordinate for Plaintiff to suggest she was being treated unfairly because of her race. TR 138. On cross-examination during trial, however, Mayor Claggett changed her story and claimed she did not know Plaintiff was Native American until she filed her administrative complaint with the EEOC. TR 152.

Plaintiff from Brenda Paradis. The document contained signature lines for both a supervisor and for Plaintiff. Plaintiff asked if she could have her lawyer review the document first; and Jo and Terri indicated that would be fine. TR 274, 394. Jo told Plaintiff she would not be driving a bus that day. Id. Plaintiff asked if she could attend a doctor's appointment, and she was given permission. TR 274. Brenda testified Plaintiff appeared to be ill. TR 393.

Plaintiff went to the doctor and received a doctor's note indicating she should not work for the remainder of the week (March 25th through March 28th). Plaintiff's sister delivered the doctor's note to Jo Hansen. TR 355. Brenda testified having Plaintiff's sister deliver the doctor's note was "absolutely" in compliance with City policy. TR 394. No City policy requires an employee to call in every day when they are ill. TR 395. Crystal had never been required to call in every day before when she had been sick. Id. Nonetheless, Brenda explained at trial that she expected Plaintiff to return the discipline document, and she thought it was "pretty important stuff." TR 394-395. She said, "we had not heard anything back from her. We had expected that she would return the document with whatever legal advice she needed. We had gone through several days[3], and she didn't call us to tell us anything." On March 27th, the City's lawyer drafted language which was incorporated into Plaintiff's termination letter. EX 30. Brenda Paradis called Mayor Claggett and told her Plaintiff was terminated for failing to show up for work. TR 145.[4] The Mayor explained, "She told me they had terminated Crystal because she had not shown up for work; she had not called and come down and they were terminating her." TR 146.

On March 27th, while she remained on legitimate sick leave, Plaintiff was terminated from her employment with a letter signed by Teri Bertness, the City Human Resources Director. The stated reason for termination was Plaintiff's "recalcitrant and insubordinate refusal to acknowledge receipt of formal disciplinary action as required by section 9.1.9 of the personnel policy manual of the City after have (sic) been advised of that requirement on March 25, 2003. . ." Section 9.1.9 of the manual provides:

> In all cases of formal disciplinary action the employee will be required to sign the written notice of discipline and such notice shall be dated and placed in the

---

[3]In reality, it was two days.

[4]According to the City's personnel manual (EX 1), an employee may be dismissed by the Department Head (in this case, Brenda) "with the approval of the mayor." See Policy 9.1.5 It was clear from the testimony of Brenda Paradis, Teri Bertness, and Mayor Claggett, that Brenda and Teri worked on the termination, along with the City attorney, and informed Mayor Claggett about it after the fact. TR 146. The same is true regarding Plaintiff's suspension: Mayor Claggett testified she told them to do "whatever they decided was appropriate. I would–I would support." TR 128.

employee's permanent personnel file. If the employee refuses to sign the notice, a notation to that effect shall be made by the decision making authority with another city employee or official as a witness.

In all instances in this policy where an employee is required to sign, signing does not imply agreement with the action, only that the contents have been made known to or discussed with the employee.

Brenda Paradis likewise never signed the formal disciplinary action which was crafted by the City Council, drafted by the City Attorney, and issued in Brenda's name. EX 26. An earlier written disciplinary action was found in Plaintiff's personnel file, also from Brenda, which was also not signed by either Plaintiff or Brenda. EX 21. Plaintiff was not reprimanded in any way for failing to sign that written discipline. Brenda's explanation for the lack of signatures on the earlier discipline was "I guess sometimes we just get busy." TR 396.

Employers may not retaliate against employees who oppose racially discriminatory conduct. 42 U.S.C. § 2000e-3(a). "Opposition must be based on a reasonable belief that an employer has engaged in discriminatory conduct . . ." EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998). A short period of time between the protected conduct and the discriminatory conduct supports an inference of causation. Id. The Plaintiff need not disprove all reasons offered by the Defendant for the discharge. "The fact that [the employer] offered evidence of legitimate motive does not change this standard. The jury may weigh and reject such evidence as pretextual." Id. at 555.

Opposition to racially discriminatory conduct (protected activity) need not rise to the level of a formal complaint to the EEOC, or formal charges of racial discrimination. Mere complaints about: ethnic slurs, unfavorable comments about "immigrants", or a racially biased work environment suffice as "protected activity" for purposes of protection from retaliation under 42 U.S.C. § 2000e-3(a). See Gumbhir v. Curators of the University of Missouri, 157 F.3d 1141, 1144 (8th Cir. 1998) cert. den. 526 U.S. 1005, 119 S.Ct. 1143, 143 L.Ed.2d 21 (1999) (referring to the Defendant's claim that such complaints were not protected activity as "frivolous").

Plaintiff presented evidence that she felt her department head (Brenda) made racially offensive comments to her on several occasions. Plaintiff testified that she brought her discomfort about the comments to the attention of her immediate supervisor (Jo), who spoke to Brenda about it. Also, on at least one occasion, the entire workplace was reprimanded for calling Plaintiff "Fry Bread"–a nickname which Plaintiff told her supervisors she found racially offensive. Plaintiff credibly testified that she complained to the mayor and the City Council that she believed she had been discriminated against based on her race when she was suspended from her job without pay after a single accident, when several other drivers received no discipline at all after they were involved

in similar (or worse) accidents.

Brenda Paradis explained that her comments regarding Plaintiff's Native American heritage were not meant to offend but rather to express interest. Teri Bertness explained that the circumstances surrounding the other drivers' accidents were dissimilar. Mayor Claggett claimed confusion regarding whether or when Plaintiff had complained to her or the City Council about racial discrimination. In the end, however, the simple facts are these: Plaintiff work record was, for the most part, good. She had been reprimanded a few times before she made complaints about racial issues, but none of her reprimands had any significant impact on her annual reviews or compensation, or resulted in any adverse employment action. She had never been required to sign a written reprimand, and had never been required to call in every day when she was out on sick leave. After Plaintiff complained about racial name calling and after she challenged as discriminatory her three day suspension, however, her Department Head (Brenda)–the very person whom Plaintiff believed had been her primary antagonist regarding racially inappropriate remarks, along with the Human Resources Director (Teri), decided to terminate her employment. The purported reason for termination was Plaintiff's "recalcitrant and insubordinate refusal to acknowledge receipt of formal disciplinary action . . ." while she was out on a legitimate sick leave, approved by her supervisors. Plaintiff had never before been required to sign a disciplinary action, nor had she ever before been required to check in on a daily basis while out on sick leave. When Brenda was asked about an earlier discipline that was not signed by either Plaintiff or herself, Brenda's explanation was "sometimes we get busy." Given this brusque answer, along with the general demeanor of the witnesses, and the inconsistencies between the discipline meted out to Plaintiff and other drivers with similar accidents, the jury's apparent rejection as pretextual of the Defendant's stated reason for Plaintiff's dismissal was not surprising.

The Court has, as it must, relied on its own reading of the evidence, weighed the evidence, and the credibility of the witnesses. Ryan v. McDonough Power Equipment, Inc. 734 F.2d 385, 387 (8th Cir. 1984). The Court is not "left with a definite and firm conviction that the jury has erred." Id. No miscarriage of justice has occurred. The jury's verdict is not "egregious." "Accordingly, [this] court [will not] disturb [the] jury's evaluation of a witness's credibility." DLC Management Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2nd Cir. 1998). Defendant's Motion for New Trial will be conditionally DENIED.

### B. Plaintiff's Motion for New Trial (Doc. 50)

Plaintiff moved for a new trial on the race discrimination claim. She relies on primarily the same evidence to support her race discrimination claim as she does to support the verdict in her favor

on the retaliation claim.  The Defendant correctly asserts, however,  the retaliation verdict in Plaintiff's favor in no way mandates a Plaintiff's verdict on the race discrimination claim.

"A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable *belief* that the underlying challenged conduct violated the law."  Salitros v. Chrysler Corp., 306 F.3d 562, 569 (8th Cir. 2002) (emphasis added). It appears that is exactly what the jury found  in this case.  The Plaintiff was a sincere, credible witness.  She presented evidence which she believed showed her department head was racially biased.  She also presented evidence which showed that she was disciplined, but not terminated, after she was involved in an accident with her bus.

Defendant, however,  offered other reasons for Plaintiff's suspension and re-suspension which were not related to her race (for example, it distinguished the other driver's accidents by explaining some did not have passengers on their buses, some were not issued traffic citations, and Plaintiff did not immediately and clearly notify her supervisors of the citation).  Based on the evidence presented, the jury could reasonably have found the suspension (and re-suspension by the City Council) were based on non-discriminatory reasons.  The Court may rely on its own reading of the evidence, but it may not "substitute its judgment for the jury's, granting a new trial whenever it would find differently than the jury has."  Ryan v. McDonough Power Equipment, 734 F.2d 385, 387 (8th Cir. 1984).  But after Plaintiff continued to pursue her claim of discriminatory treatment, Brenda, the department head, the person against whom most of her allegations were made, and who had the power to terminate her employment  played a large role in deciding to terminate  her.  The stated reason for termination was Plaintiff's refusal to acknowledge her disciplinary action.  At trial, however, all of Plaintiff's supervisors admitted Plaintiff was given permission to take the disciplinary notice to her lawyer for review, and that she was  on a legitimate sick leave when her employment was terminated.  They likewise admitted Plaintiff had previously been issued a written discipline which neither she nor Brenda had signed (with no repercussions) nor had she before been required to call in daily when on sick leave.

There is no dispute that Brenda–the person with the power to terminate Plaintiff and the person who took an active role in deciding to terminate Plaintiff- knew Plaintiff was Native American.  Brenda  was the person in the workplace who Plaintiff perceived as most antagonistic toward her, based on her race.  Plaintiff was suspended by Brenda for the accident.  Brenda's imposed suspension was vacated by the City Council.  Instead the City Council imposed the same three day suspension for insubordination.  Plaintiff was terminated only after she continued to claim discrimination.  The termination occurred when she was on legitimate sick leave, and the stated

reason was for refusal to acknowledge her disciplinary action–which she had been given permission to take to her lawyer for review.  Given all of this evidence, the jury's apparent finding that the Defendant did not initially discriminate based on Plaintiff's race, but did retaliate against Plaintiff for engaging in a protected activity, is entirely reasonable.  Plaintiff's Motion for New Trial on the race discrimination claim will be  DENIED.

### C.  Defendant's Alternative Motion for Remittitur (Doc. 48)

Defendant moved alternatively for remittitur of the jury's damage award. "If a damage award is excessive or so large as to appear contrary to reason, a remittitur is the appropriate relief.  A remittitur is in order when a trial judge concludes that a jury verdict is clearly unsupported by the evidence and exceeds the amount needed to make the plaintiff whole, i.e. to remedy the effect of the employer's discrimination. A court should not reduce a damage award merely because it would have chosen to award less money."  Hughes v. Regents of the University of Colorado, 967 F.Supp. 431, 437 (D.Colo. 1996).

The first basis for the Defendant's motion for remittitur is the jury's award for past lost wages and benefits. The jury awarded $64,270.00 for past lost wages and benefits. The jury was instructed in Instruction No. 20 regarding this form of damages. The jury was instructed in relevant part:

> You must determine the amount of any wages and fringe benefits plaintiff would have earned in her employment with defendant if she had not been disciplined on March 13, 2003, or discharged on March 27, 2003, through the date of your verdict, *minus* the amount of earnings and benefits that plaintiff received from other employment during that time.
>
> Remember, throughout your deliberations, you must not engage in speculation, guess or conjecture . . .

Plaintiff testified she earned approximately $11.00 per hour at the time she was terminated. TR 289. See EX. 15.  She testified she had received regular raises since she began her employment, and expected she would have been making approximately $13.00 per hour as of the date of trial, had she not been terminated. TR 290.  She received regular raises as of her anniversary hire date.  TR 290, EX 14, 15. After she was terminated, she immediately began searching for other employment, but had a difficult time because she felt she needed to be honest with her potential employers about being fired from her job with the City.  TR 278.  She was unemployed until May, 2003.  Plaintiff also testified that she lost other benefit programs when she was terminated from the City, such as participation in the retirement program, health insurance, dental insurance, and a family membership in the City's recreation center.  TR 281-82, EX's 9-12.  She was hired part-time at UPS in May, and regained a benefit plan there.  TR 288-89.  Plaintiff also obtained two other part-time jobs, (EX 41)

but is hoping the UPS job will evolve into full time. TR 285.

According to Defendant's calculations, Plaintiff was "unemployed" with the City for wage loss calculation purposes for 42 weeks in 2003, 52 weeks in 2004, and 3 weeks in 2005 (i.e. through the date of the verdict). Her wage had she remained employed by the City would have been $11.00 per hour from March 13, 2003 through September 23, 2003 (27 weeks).  It would have been $12.00 per hour from September 23, 2004 through September 23, 2004 (52 weeks), and S13 per hour from September 23, 2004 through January 20, 2005 (17 weeks).

The wage information provided in EX 41 reveals Plaintiff earned $86.63 from CK West, $1,256.94 from Coburn's, and $2,338.36 from UPS, for a total of $3,680.93 in 2003 from other employers. In 2004, Plaintiff earned $3,952.51 from Coburn's and $4,679.68 from UPS, for a total of $8,632.19 from other employment.

It is incumbent upon the Court to condition  denial of a motion for new trial on an order of remittitur if an award of back pay  placed the victim in a better position than she would have been but for the discrimination. Vernon v. Port Authority of New York, 2003 WL 1563219 (S.D. N.Y.). Remittitur is appropriate when the back pay award appears to have been made based on "imprecise calculations and insufficient information." Id. at *3.  While the findings of liability/non-liability on the retaliation and race discrimination are supported by sufficient evidence, the jury's lost wage/benefit award cannot be supported. Therefore, remittitur will be ordered on this portion of the damage award. Alternatively, if Plaintiff is unwilling to accept remittitur, a new trial will be ordered.

Plaintiff presented sufficient evidence of lost wages.  She testified she was earning $11.00 per hour at the time of her termination.  She presented evidence she would have received annual wage increases of approximately $1.00 per hour had she remained employed with the City.  Her earnings were reduced because she was able to secure only part-time  employment after her termination.  From this, the jury could have calculated her lost earnings through the date of the verdict.

Plaintiff also testified she participated in every benefit program the City had to offer (health insurance, dental insurance, retirement plan, and the ability to purchase a reduced cost membership in the City's recreation center).  Plaintiff's testimony and the exhibits received into evidence, however, were insufficient to place a dollar value on these benefits.  For comparison, see Prine v. Sioux City Community School District, 95 F.Supp.2d 1005, 1014 (N.D. Ia. 2000) "Dr. Brown testified Plaintiff would have received $273 per month in medical insurance, $21.10 per month in dental insurance, S4.80 per month for term life insurance, and that the school district would have contributed 5.75 percent of Prine's gross annual income to the Iowa Public Employee Retirement

System. Based on these figures, Prine would have received $5,277.80 in fringe benefits per year."). There simply was no such specific evidence presented in this case upon which the jury could have awarded damages for the loss of fringe benefits.

Plaintiff testified EX 42 represented her total South Dakota Retirement System (SDRS) contribution during the course of her employment (TR 286) and that her employer "matched" the contribution (TR 287). The record is unclear whether the City "matched" Plaintiff's contributions up to a certain percentage, or without limitation. Plaintiff's City W-2 from 2003 shows an SDRS amount of $364.27. It is impossible to discern, however, how Plaintiff's earnings and her "matched" funds were accounted for on EX 42. In other words, if one assumed Plaintiff would have earned $13.00 per hour in 2005, how her earnings would have been reflected on her W-2 for that year and how much would have translated into her contribution to SDRS and how much the City would have contributed to SDRS on her behalf is simply impossible to determine on this record.

Given these uncertainties, the jury's past wage and benefit award cannot be sustained. Using Plaintiff's estimates, she would have earned the following from the date she was suspended until the date of trial had she remained employed by the City:

| | |
|---|---|
| March 13, 2003 - September 13, 2003 | $11 x 40 hrs x 27 wks = $11,880 |
| September 23, 2003 - September 23, 2004 | $12 x 40 hrs x 52 wks = $24,960 |
| September 23, 2004 - January 20, 2005 | $13 x 40 hrs x 17 wks = $ 8,840 |
| TOTAL | $45,680 |

From this amount, however, must be subtracted what Plaintiff earned from other employment between the time she was suspended and the date of trial. The evidence showed that amount was $12,313.12. The greatest amount of lost wages/benefits award supported by the evidence, therefore, is ($45,680-$12,313.12), or $33,366.88. Denial of Defendant's motion for New trial is conditioned on Plaintiff's acceptance of remittitur of the lost wages and benefits portion of the jury's damage award from $64,270.00 to $33,366.88.

The Defendant also moves for remittitur of the jury's damage award for other damages, excluding lost wages and benefits. Jury instruction No. 20 stated in relevant part: "You must determine the amount of any other damages sustained by plaintiff, such as future emotional pain, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." The jury awarded $115,000.00 for this category of damages. The Defendant asserts this damage award cannot be sustained, because the only evidence presented to support it was Plaintiff's own testimony.

Regarding compensatory damage awards, the Eighth Circuit has cautioned, "awards for pain

and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." Eich v. Board of Regents, 350 F.3d 752, 763 (8th Cir. 2003 ). Such awards should not be set aside unless they "shock the conscience." Mathieu v. Gopher News Co., 273 F.3d 769, 783 (8th Cir. 2001). In Eich, the jury awarded $200,000 for emotional distress, based on plaintiff's own testimony. The Eighth Circuit reviewed several emotional distress awards which had been affirmed ranging from $50,000 to $165,000 based on varying degrees of proof. Id. It held the trial court erred by remitting the $200,000 emotional distress verdict because "we cannot hold that the jury verdict, as rendered, shocks the judicial conscience." Id. at 764.

In this case, Plaintiff testified she had never been fired from a job before. It made her feel, and makes her feel, "horrible." TR 276. The loss of her job was stressful for her because she was not "pulling her weight" in the family. TR 277. It has affected her friendships. TR 276. She lost a good friend who was employed by the City, with whom she used to have lunch every day. That person has not spoken to her since she was terminated. TR 276. She misses the passengers she used to transport on her bus. One of them tracked her down, crying, and brought her candy and fruit. TR 276. She explained how odd she feels when she sees her former passengers–the elderly–and they inquire how she is doing, and she cannot explain why she is not driving them anymore. TR 277. Plaintiff also explained how the loss of her City job has put a lot of financial hardship on her family. TR 277. They had just purchased a house before her termination, and she was planning to work for the City until she retired. TR 277. They continue to struggle financially. TR 278. She had to cash in her City retirement benefits to make the house payments. TR 287. Her children, who are very sports-oriented, have not been able to go to the rec center since the day she was fired because they cannot afford it. TR 278. They struggle to afford groceries. TR 278. She and her husband have had many arguments because of her termination, usually about money. TR 278. She had a hard time finding a job for the first time in her life, because she had to tell prospective employers she'd been fired from the City. TR 278-79.

Plaintiff's testimony regarding her emotional distress is sufficient to sustain the jury's award of $115,000.00. "Compensatory damages for emotional distress must be supported by competent evidence of a genuine injury and a plaintiff's own testimony can carry this burden." Rowe v. Hussman Corp., 381 F.3d 775, 783 (8th Cir. 2004). In this regard, Plaintiff's credibility and demeanor are relevant. As already explained, Plaintiff was a credible and sincere witness. It was apparent, however, that she was no wilting violet. When she testified about how difficult the loss of her job was for her, she did lose her composure for a moment. It was obvious this was not a

common occurrence for her.  She explained her job with the City (which paid an annual salary of $22,773–see EX 15) was a "step up" for her.  She explained how much she was looking forward to retiring with the City.  She explained how "wonderful" the retirement plan was.  She explained she was hoping to take advantage of the South Dakota Retirement System plan so she and her husband could "retire and enjoy life afterwards." TR 282.  Plaintiff's testimony made it clear the loss of her City job was a huge loss for her, financially and emotionally.  "To prove emotional distress, medical or other expert evidence is not required.  Instead, a plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 893 (8th Cir. 2000).  See also Mathieu v. Gopher News Co., 273 F.3d 769, 783 (8th Cir. 2001) (affirming a compensatory damage award for $165,000 even in the absence of evidence that the plaintiff required any type of medical treatment for emotional distress, noting defendant's argument such testimony was required "misses the mark.").  In Mathieu, as in this case, "the award was not simply for emotional distress, but was made for a combination of factors including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life." Id.  Plaintiff sustained her burden.  Defendant's motion for remittitur as to the "other" damages will be DENIED.

**D.    Plaintiff's Motion for Front Pay (Doc. 52)**

"After a finding of discrimination, the court has an obligation fulfill the make whole purposes of Title VII." Cowan v. Strafford R-VI School District, 140 F.3d 1153, 1160 (8th Cir. 1998).  Among the ways the Court may make the employee whole are reinstating her to her previous employment, or awarding front pay.  Reinstatement and front pay are equitable remedies, and a district court's award of such remedies are reviewed for an abuse of discretion. Standley v. Chilhowee R-IV School District, 5 F.3d 319, 321-22 (8th Cir. 1993).  If the trial court decides not to reinstate, then it has discretion whether or not to award front pay. Id. [5]  In determining whether a front pay award is appropriate, courts strive to make the employee whole, while avoiding a windfall to the employee. Moysis v. DTG Datanet, 278 F.3d 819, 829 (8th Cir. 2002).  Plaintiff has moved for an award of front pay for a period of five years.  The Court invited the parties to move for a hearing on front pay, but neither party requested a hearing.  Plaintiff asserts the evidence presented at trial, along with her

---

[5]"Extreme animosity" is usually cited as a reason to choose front pay in lieu of reinstatement. Id.  In this case, the trial testimony made clear animosity exists between Plaintiff and her former supervisors, based on what the supervisors perceived as "insubordination" on Plaintiff's part, and what Plaintiff perceived as racial discrimination by the supervisors.  Neither party has suggested reinstatement is appropriate.

post-trial affidavit, is sufficient to make the front pay determination.[6]

There are several factors to be determined in deciding whether a front pay award is appropriate. They are succinctly enumerated in <u>Prine v. Sioux City Community School District</u>, 95 F.Supp.2d 1005, 1011 (N.D. Ia. 2000): (1) the plaintiff's age–**39.** Plaintiff's age should not prevent her from finding other, comparable employment; (2) the length of time the plaintiff was employed by the defendant employer–**three and one half years.** While this term of employment is commendable and is not suggestive of someone who is a "job hopper" it is not prohibitive in terms of Plaintiff's marketability in the workplace; (3) the likelihood the employment would have continued absent the discrimination–**probably good.** Defendant introduced evidence at trial regarding a few disciplinary incidents, but these incidents were apparently never significant enough to have a negative impact on Plaintiff's job evaluations, which were consistently good, or her raises, which were consistent and also good; (4) the length of time it will take the plaintiff, using reasonable effort, to secure comparable employment–**plaintiff secured other employment, albeit part-time** within a few months. She testified her wages at her new job are not as good as they were with the city, but her benefits are comparable. Retirement benefits are offered at UPS, but she is apparently not participating in that program. Plaintiff started out at the bottom of the seniority level with UPS, but hopes to obtain a driver's job there, and more hours; (5) the plaintiff's work and life expectancy–**plaintiff indicated she intends to work until age 65. There was no evidence presented regarding life expectancy.** (6) plaintiff's status as an at-will employee–**Both parties agree Plaintiff was an at-will employee;** (7) the length of time other employees typically held the position lost–**little evidence presented in this regard, other than Mr. Schrank who testified he'd been employed by the City for eight years total, a year and a half as a bus driver.** Common sense indicates, however, that someone such as the Plaintiff, with little or no post-high school formal education or transferrable skills, would, as she testified, hold on to a governmental job that offered good benefits and the ability to participate in a state pension plan as long as possible–maybe until retirement age; (8) the plaintiff's ability to work–**the Plaintiff is able to work;** (9) the plaintiff's ability to work for the defendant-employer–**neither party suggests reinstatement is appropriate;** (10) the employee's efforts to mitigate damages–**Plaintiff has made a good faith attempt to mitigate her damages.** EX 34 suggests plaintiff made a legitimate effort to find other work. She had a difficult finding other employment because of the stigma of being fired from her

---

[6]The absence of a post-trial hearing regarding front pay is not fatal to Plaintiff's claim. See <u>Salitros v. Chrysler Corporation</u>. 306 F.3d 562 (8th Cir. 2002).

City job. She ended up taking three part time jobs to replace her full time job with the City. She accepted the part time job at UPS because it offered benefits, and she works her other part time jobs around the UPS job. She hopes the UPS job will ultimately be full time, but was low in seniority at the time of trial. She had applied for a driver's position, and was waiting to take a training course as soon as it was offered; (11) the amount of any liquidated or punitive damage award made to plaintiff–**No punitive damages, $33,336.88 in back pay if Plaintiff accepts remittitur, and $115,000 in compensatory damages.**

"The calculation of front pay, which is necessarily uncertain, is a matter of equitable relief within the court's sound discretion." Hukkanen v. Internantional Union of Operating Engineers, 3 F.3d 281, 285 (8th Cir. 1993). Plaintiff's trial testimony estimated her current wage at $13.00 per hour if she were currently employed by the City, based on her past wage increases. (She began at $7.78 per hour in September, 1999 and her last recorded pay increase was to 10.94 per hour in September, 2002, an increase of $3.16 over a three year period). Plaintiff's estimated current wage for purposes of her front pay motion, however, was $12.09 per hour based upon the other city driver's pay rates, published in the Mitchell newspaper (it is noted, however, the date on the newspaper referenced is January, **2004**, while this matter went to trial in January, **2005**). The $13.00 per hour estimate, therefore, was a reasonable estimate based on the information which was available to the jury for purposes of determining back pay. Exhibit A, attached to Plaintiff's affidavit in support of front pay (Doc. 54) reveals that the apparent top wage for bus drivers –at least as of January, 2004, was $12.09, and that Plaintiff's former direct supervisor (Jo Hanson) earned $13.77 per hour. The $12.09 wage information was provided to the Court after trial for purposes of the front pay issue, which is for the Court to decide.[7]

Plaintiff will be awarded two years of front pay, from the date of the verdict (i.e. until January 20, 2007). This will place Plaintiff nearly four years from March, 2003–her termination date. Four years is nearly equal to the amount of time Plaintiff was employed by the City. Four years is also a sufficient amount of time for the stigma of being fired from her City job to fade, and for her to either work her way up the seniority chain at UPS, or to rebuild a work-related reputation and find other full-time employment elsewhere.

---

[7]It is unknown why the driver's rate as of 2004, rather than 2005, was provided to the Court for purposes of the front pay motion, when an estimate of current, 2005 driver's wages was provided to the jury for the back pay award consideration. Nevertheless, that was the evidence provided to the jury for that determination, and this is the evidence provided to the Court for this determination.

Front pay will be awarded based on the assumption Plaintiff would be, if still employed by the City, earning $12.09--the same as the other bus drivers' rates published in the Mitchell newspaper (Gary Gowdy and Roger Scharffenberg).[8]   It will also be awarded based on the assumption that Plaintiff's hours at UPS will increase as her seniority increases, and that she will choose to devote her working hours to her higher paying job, rather than her lower paying part-time job with Coburns. It will therefore be assumed that Plaintiff's "replacement wages" at UPS for the two year front pay award will be $9.50 per hour at 25 (twenty-five) hours per week. The calculation of Plaintiff's front pay award, therefore, is as follows:

Plaintiff's wages assuming continued City employment:

$12.09 x 40hrs x 52 weeks = $25,147.20 x 2 years = $50,294.40

LESS:

Plaintiff's replacement wages:

$9.50 x 25 hrs x 52 weeks = $12,350 x 2 years =      $24,700.00

**TOTAL FRONT PAY AWARD:**                          **$25,594.40**

### E. Plaintiff's Motion For Attorney's Fees (Doc. 55)

Finally, Plaintiff has moved for an award of attorney's fees pursuant to 42 U.S.C. § 2000e-5(k). That statute states in relevant part:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of its costs . . .

"A district court's award of attorney's fees is reviewed for abuse of discretion." Emery v. Hunt, 272 F.3d 1042, 1046 (8th Cir. 2001). There are three measures of "success" which pertain to civil rights lawsuits for purposes of awarding attorney's fees: plaintiff's success claim by claim, the relief actually achieved, and the society importance of the right which has been vindicated. Rodriguez v. Miranda-Velez, 132 F.3d 848, 859 (8th Cir. 1998). In a civil rights lawsuit, "the result is what matters." Id.

"The most useful starting point for determining the mount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Reasonable hourly rates are the prevailing market rates in the relevant community." Forshee v. Waterloo Industries, Inc., 178 F.3d 527, 532 (8th Cir. 1999) (citations omitted).   Plaintiff's counsel has submitted an Affidavit indicating she spent 104.1 hours working on Plaintiff's case, and that her

---

[8]There will be no allowance made in the front pay award for the benefits Plaintiff received at her City employment for the reasons explained earlier, regarding remittitur of the back pay damages awarded by the jury.

customary hourly rate is $175.00 per hour. The Court has carefully reviewed Plaintiff's billing statement and finds that the expenditure of 104.1 hours of time is exceptionally prudent and reasonable for the preparation and trial of this civil rights case.[9]

Plaintiff's counsel also requests the Court to consider an "enhancement" of her fee to $200.00 per hour because that is the customary fee in Sioux Falls and is customary for counsel who regularly litigate civil rights matters. (Plaintiff's counsel is from Gregory, South Dakota, and Plaintiff is from Mitchell, South Dakota). Plaintiff also requests an increase in the lodestar based on several factors as enumerated in Jaquette v. Blackhawk County, Iowa, 710 F.2d 455, 459 (8th Cir. 1983). These factors include: the novelty and difficulty of the questions, the skill requisite to perform the legal service properly, the preclusion of other employment by the attorney due to acceptance of the case, the customary fee for similar work in the community, whether the fee is fixed or contingent,[10] time limitations imposed by the client or circumstances, the amount involved and results obtained, the experience, reputation, and ability of the attorneys, the "undesirability" of the case, the nature and length of the professional relationship with the client, and awards in similar cases. The Court has considered all these factors. While the case was hard fought and the facts were hotly disputed, the legal theories were not novel or exceptionally difficult. All the attorneys involved represented their clients with the high degree of skill this judge has come to expect in this community. Plaintiff's counsel explained that other work needed to be postponed while this matter was tried, but that is to be expected when any matter proceeds to trial rather than settlement. Plaintiff's counsel has already explained that $175.00 per hour is her customary fee, while a Sioux Falls attorney submitted an affidavit explaining $200.00 per hour is the customary fee in Sioux Falls. Time constraints do not appear to be a factor. The results obtained were good. Plaintiff's counsel is an able, experienced trial lawyer. While it is never an easy task to sue a governmental agency, the case was not particularly "undesirable" especially in light of the probable cause finding which was issued by the Division of Human Rights. The length of the lawyer/client relationship was relatively short, and apparently did not exist before the facts surrounding this lawsuit arose. There was no evidence

---

[9]The Defendant's claim that Plaintiff's attorney should be penalized for a few instances in which she faxed documents to the Human Rights commission, etc. is without merit. On the whole, Plaintiff's counsel did no "fluff" billing, and on those few occasions where her billing entries include faxing documents to counsel or the Commission, it is impossible to tell whether the billing also includes drafting the correspondence which was faxed.

[10]The Court notes the Supreme Court has held that lodestar enhancement for contingency fee arrangements is not permitted under the federal fee shifting statutes. See Forshee v. Waterloo Industries, Inc., 178 F.3d 527, 532 (8th Cir. 1999), citing City of Burlington v. Dague, 505 U.S. 557, 567, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

presented regarding awards in similar cases.  Regarding enhancement, the Eighth Circuit has clarified, "an upward adjustment to an attorney's lodestar hourly rate is permissible in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts."  Forshee v. Waterloo Industries, Inc., 178 F.3d 527, 532 (8th Cir. 1999).  Because the lodestar amount already compensates the applicant for "exceptionally good service and results" the applicant must do more than establish outstanding service and results to entitle him or her to an enhancement.  Id.  While the Plaintiff's counsel provided exceptionally good service and results, this is not one of the "rare and exceptional" cases in which the lodestar should be enhanced.  Attorney's fees will be awarded at $175.00 per hour.

Neither, however, will Plaintiff's attorney's fees be reduced based on her "limited success" as the Defendant asserts.  While Plaintiff prevailed on her retaliation claim, but not on her discrimination claim, both claims were "based on a common core of facts and on related legal theories."  See Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 859 (8th Cir. 1998).  Plaintiff received a substantial monetary award constituting full compensation for her injuries.  The jury awarded her all types of damages provided for in the verdict form.   When a plaintiff prevails on some claims but not others, she may be compensated for "time spent on unsuccessful claims that were related to [her] successful claims, but not for time spent on unsuccessful claims that were distinct in all respects from [her] successful claims.  Claims are related, and hence deserving of compensation, if they involve a common core of facts or are based on related legal theories."  Emery v. Hunt, 272 F.3d 1042, 1046 (8th Cir. 2001).  Plaintiff's discrimination claim and retaliation claim were intimately related and intertwined and could in no way be characterized as "distinct in all respects."  The most critical factor in deciding whether a fee reduction is appropriate is the result the attorney obtained for her client.  "Where a plaintiff has obtained excellent results, [her] attorney should recover a fully compensatory fee."  Id.  Ms. Pochop will be fully compensated.

The primary purpose of fee shifting statutes is to "promote diffuse private enforcement of civil rights law by allowing the citizenry to monitor rights violations at their source, while imposing the costs of rights violations on the violators . . .If successful plaintiffs were routinely forced to bear their own attorney's fees, few aggrieved parties would be in the position to advance the public interest."  Casey v. City of Cabool, Missouri, 12 F.3d 799, 805 (8th Cir. 1993) cert. den. 513 U.S. 932, 115 S.Ct. 325, 130 L.Ed.2d 255 (1994).  Plaintiff will be awarded attorney's fees pursuant to 42 U.S.C. § 2000e-5(k), at the rate of $175.00 per hour, for 104.10 hours or $18,217.50, plus sales tax (6%) of $1,093.05, for a total of $19,310.55.

## CONCLUSION AND ORDER

Based upon the foregoing discussion, it is hereby ORDERED:

(1)     Defendant's Motion for New Trial (Doc. 48) is conditionally DENIED conditioned upon Plaintiff's consent to Remittitur of the back pay award;

(2)     Plaintiff's Motion for New Trial (Doc. 50) is DENIED;

(3)     Defendant's Motion for Remittitur of the back pay award (Doc. 48) is partially GRANTED as to the back pay award conditioned upon Plaintiff's consent to Remittitur;

(4)     Plaintiff's Motion for Front Pay (Doc. 52) is GRANTED conditioned upon Plaintiff's consent to Remittitur;

(5)     Plaintiff's Motion for Attorney's Fees (Doc. 55) is GRANTED conditioned upon Plaintiff's consent to Remittitur.

(6)     Plaintiff's Counsel shall file a notification with the Clerk of Court by Friday, October 14, 2005, advising whether Plaintiff consents to Remittitur. After notice is received, either an Amended Judgement or an Order for New Trial limited to damages (all damages) for the Retaliation Claim will be entered.

Dated this ___30th___ day of September, 2005.

BY THE COURT

John E. Simko
Magistrate Judge

ATTEST:
Joseph Haas, Clerk

By: _Sharon Louro_
(SEAL)